Mr. Justice SWAYNE:
I concur in the judgment of the court just announced, but as the case involves important legal principles I prefer to give my views iu a separate opinion.
Pursuant to the act of Congress of September 9th, 1850,† the United States issued to the State of Texas their bonds-to .the amount of. five millions of-dollars. They were dehpminated on their.face “ Texas-Indemnity"Bonds.”- They *85 all .bore date January 1st, 1851. Each one was for $1000. It was certified on their face “ that the United States of America are indebted to the State of Texas or bearer” in, that sum, “ redeemable after the 31st of December, 1864 with interest at the rate of five per cent, per annum, payable on the first days of January and July in each year, at the Treasury of the United States, on presentation and surrender of the proper coupon hereto attached,” and that the bond “ is transferable by delivery.” Coupons were attached extending to December 31st, 1864. Texas, received them and placed them in her treasury. On the 16th of December, 1851, her legislature passed an act whereby it was provided “that no bond issued as aforesaid, as a portion of the five million of stock payable to bearer, shall be available in the hands of any holder until the same shall have been indorsed in the city of Austin by the governor of the State of Texas.” A large portion of the bonds were indorsed by the' governor and disposed of pursuant to other acts of th~e legislature. Acts were passed from time to time appropriating other portions for different purposes. Some of these acts prescribed a different mode of transfer,'and some were silent upon the subject. ■ Transfers were made in such cases without the governor’s indorsement. On the lltli of January, 1861, the provision requiring his indorsement was repealed. On the same day a military board was created and authorized to prepare the State for defence, and for that purpose to use the bonds still in the treasury to the extent of a million of dollars.. - This action was taken by the State with the view,of engaging in the war of the rebellion, then impending, against the United States. On the 12th of January, 1865, the military board entered into a contract with White and Chiles, in pursuance whereof $135,000 of the bonds were sold and delivered to them. On the 15th of February, 1867,' the State of Texas filed in this court an original bill against White and Chiles and others, wherein it was charged that the repeal of the requirement of the governor’s indorsement and the contract with White and Chiles were in aid of the rebellion and therefore void, and it sought to recover back *86 the bonds or their value from White and Chiles and the other defendants to whom it was alleged White and Chiles had transferred portions of them. This court decreed against White and Chiles.* The case stood over as against Hardenberg, o.ne of the other defendants. Subsequently a decree was rendered against him.† The State also sued William S. Huntington, at law, in the Supreme Court of the •District of Columbia, for the conversion of certain of the bonds redeemed at the .Treasury, {he proceeds whereof had gone to him. The State recovered as to thirteen of these bonds and failed as to the residue. The judgment was brought to this court úpqn error'and reversed.‡
The case made in the record before us by the complainant, so far as is necessary to state it, is as follows:
It is alleged that the military board for insurrectionary purposes.'sold and delivered to’White and Chiles one hundred and thirty-five of the bonds; that thirty-three of these bonds, after becoming past due, were sold to the bank, or were-placed in its hands to collect for White and Chiles, with full knowledge of the manner in which White and Chiles had obtained them, and in bad faith on the part of the bank; and that the bonds had never been indorsed in such manner as to pass the title out of the State of Texas. The prayer is that the bank be enjoined from receiving the amount dué on the bonds from the United States; that they may be delivered up to the State, if still in the possession of the bank, and if not, that the bank may be decreed to pay theiivyalue to the State. A copy of the contract of the military board with White and Chiles is annexed to the bill.
. The bank and Huntington answered jointly. The answer, among other things—
Denies all knowledge of the transactions between the military board. and White and Chiles ; it denies that they hold or claim the bonds described in the bill; it denies that they were in ^ny way the agents of White and Chiles or bought any bonds from them; it denies that they had any knowl *87 edge that their bonds came through White and Chiles; it avers that they had heard there would be diffiéulty about1 the White and Chiles bonds, and before purchasing, made diligent inquiry at the Treasury Department; that no one there could identify the bonds in question as White and Chiles’s,bonds, and that the bank bought them-believing they were not such; it avers that they knew the Secretary - of the Treasury had paid similar bonds, and gives a.large list of such bonds; it denies all knowledge of White and Chiles.
The court below decreed against the bank for the value of nineteen bonds and interest. Those bonds are numbered in the decree as follows: 4226, 4227, 4229, 4703, 4705,-4706, 4748, 4813, 4825, 4843, 4844, 4912, 4927, 4928, 4929, 4960, 4961, 4962, and 4963.
The bank removed the case to this court by appeal, and it is now before us for review. The complainant did not appeal. This defines the ground of the controversy in this court between the parties, and narrows the circle of inquiry to the bonds numerically specified in the decree.
There is neither proof nor admission in the record of the execution of the contract of the military board with White and Chiles. It must, therefore, be laid out of view..
Averments by the complainant, vital in the case, are .denied by the answer. The answer is responsive and the denials absolute. This throws the burden of proof upon the complainant, and the denials are conclusive unless-overcome ■by the testimony of two witnesses to the contrary, or e testimony of one wfitness, and circumstances established otherwise equal in effect to the direct testimony of another.
' The effort of Texas to leave the‘Onion was revolutionary.' All her, legislative acts for the accomplishment of'that olrect were void. Her position has been aptly resembledHo that of a county in rebellion against the State.* While her enactments outside of-the sphere of her normal authority were *88 without validity, those within it, passed for the ordinary administration. of her powers and duties as a State, had the same effect as if the rebellion had not occurred. Tho.latter principle springs from an overruling necessity. A different rule would involve the dissolution of the social compact, and resolve society back into its original elements.
The repeal touching the governor’s indorsement was an act of ordinary legislation. It was, therefore, within the rule last mentioned. If it had in view the promotion of the rebel cause it was too remote from that end, and its tendency too indirect to render it fatally liable to that objection. The repehl put an end to the existence of the restriction. But if the restriction had not been repealed I cannot admit that the want of the indorsement would have in any wise affected a bond fide holder, or in other words, one who had honestly bought the bonds for a valuable consideration without knowledge of any infirmity in the title of his vendor. The United States made them payable “ to the State of Texas, or bearer.” Delivery passed the title. Texas could not restrain their transferability in the markets of the world, according to the law merchant, in any case without bringing home 'notice to the party.sought to be implicated or putting upon the bonds something which must necessarily operate as a notice to every buyer.
Winston v. Westfeldl* has an important bearing upon this subject. There the holder of a promissory note had been enjoined from transferring it. He transferred it, underdue, by indorsement. The indorsee gave a valuable consideration and took it without notice of any defect. It was held that the title of the indorsee was valid, notwithstanding the injunction.
The fact that the bonds were overdue when the bank bought them does not affect the ease. The transféree of overdue negotiable paper takes it liable to all the equities to which it was subject in the hands of the payee. But those equities must attach to the paper itself, and not arise *89 from any collateral transaction. A debt due to the maker from the payee at the time of the transfer cannot be set off in a suit by the iudbrsee of the payee, although it might have been enforced if the suit had been brought by the latter.* The result is the same whether the transfer be made by indorsement or delivery. But the protection of this principle is confined to the maker or obligor. It does not. apply as between successive takers. Actual notice is necessary to affect them. There is no adverse presumption. Each one takes the legal title, and his equity is equal to that of his predecessors. “The equities being equal, the law must prevail.”† The position of the transferee must' bo at least as favorable as that of the assignee of a chose in action. There the assignee takes subject to the equity residing in the debtor, but not to an equity residing in a third person against the assignor.
Chancellor Kent, speaking of this rule in this class of cases, says: “ The assignee can always go to the debtor and ascertain what claims he may have against the bond or other chose in action which he is about purchasing from the obligee, but he may not be able with the utmost diligence to ascertain the latent equity of some third person against the.obligee. He has not any object to which he can direct his inquiries,-and for this reason the assignee, without notice, of a chose in action, was ..preferred in the late case of Redfearn v. Ferrier et al.‡ to "that of a third party setting up a secret equity against the assignor. Lord Eldon observed in that case that if this were not so no assignment could ever be taken with safety.”§ This reasoning is strikingly applicable in the case before us. It was the duty of the cashier to inquire at the Treasury Department. He did so, and learned that there was no objection to any of the bonds but those which had been delivered to White and Chiles, and he be *90 came satisfied that those involved in this controversy did not belong to that class. It was impossible for him to find and consult all those through whose hands they might have-passed before they were offered to the bank.
If negotiable paper, nnderdue, be in the hands of a bond fide holder, any subsequent holder may avail, himself of that fact against the equity of the maker.* Every holder is presumed to have acquired his title before the maturity of the instrument and bond fide. The burden of proof rests upon the party alleging the contrary.† It is only in case of dishonor that the equities of the maker, or obligor, can be set up against a bond fide holder. It may be doubted whether these bonds belouged to that class.‡ I have preferred, to consider the ease in .this aspect, upou the hypothesis most favorable to the complainant. It is unnecessary to resolve, in this case, either way the doubt suggested.
The rights of the holders of commercial paper were largely considered by this court in Goodman v. Simonds,§ and in Murray v. Lardner.|| What was there said need not be repeated.
It remains to consider the case in the light of the evidence. In order to rhaintain the decree it is necessary for the complainant to establish the following facts:
(1.) That the bonds specified in the decree were .of those disposed of by the military board to White and Chiles;
(2.) That the transaction was in aid of the rebellion;
(3.) That the bank, before it bought, had notice of the infirmity of the title of White and Chiles.
And these facts must bo established by the measure of proof requisite to overcoine the responsive denials of the answer.
It is shown by the complainant’s own testimony — and there is none to the contrary — that six of the bonds here in *91 question were transferred and delivered by the authorities of the State pursuant to an act of the legislature to the Southern Pacific Railroad Company. They are numbered 4703, 4705, 4706, 4748, 4813, and 4825. It is proved by the same testimony that four more were not of those delivered to White and Chiles. They are numbered 4960, 4981, 4962, and 4963. It is also proved that five of the bonds, Nos. 4843, 4844, 4927, 4928, and 4929, were sold to the bank by Jay. Cooke & Co. It is not shown when Cooke & Co. acquired them. It is, therefore, presumed they bought them under-due and bond fide, and their title enures to the benefit of their vendee. Three of. the bonds, Nos. 4226, 4227, and 4229, were bought by the bank of Wolf. There is some testimony tending to show that he bought after they were due. But there is no such proof as to his vendor. The presumption as to the latter is, therefore, otherwise. This ends the controversy as to these eighteen- bonds. The remaining bond is No. 4912.
The only testimony in the record in any degree adverse to the bank upon the points in is.sue, is that of Comptroller Taylor and that of Judge Paschal.
In his examination-in-chief the comptroller said:
“ From all the circumstances, my opinion is those were of the White and Chiles bonds. That is only an opinion, however ”
On cross-examination :
“ Q. Do you know, of your own knowledge, that White and Chiles, or either of them, ever saw one of these bonds?
“A. I know it .only from the papers on file in the department; that \s,from my opinion of what those papers shoiv.
“ They are too numerous for me to present here now, ahd I might add, that’one would have to study them very carefully, and make his calculations as to the different bonds.
“It would be by taking the seven hundred and eighty-two bonds that were not indorsed, and tracing them back by the evidence into the hands of those parties who held them at different timesj and ascertaining, in some instances, the particular numbers that were known to be in the hands *92 of particular parties before the transaction between White and Chiles and the military board, and taking others, again, that came from the State of Texas, and then drawing my conclusions as to what were White and Chiles's bonds.”
With .these admissions before us it is sufficient to remark that his testimony is clearly incompetent.* And, if not so, it would be insufficient to maintain, in behalf of the complainant, the issue between the parties. The same remarks are applicable to the testimony of Judge Paschal. So far as it affects this case it is liable to the same objections. He says, among other things: “I was employed by Governor Pease to prosecute this suit, and caused it to be instituted in 1868; and judging from a careful examination made in Texas, and in the Treasury Department here, I feel confident ■that the bonds redeemed for the bank, described by Mr. Taylor, were a part of the bonds which passed through the hands of White and Chiles, and I judge this from the-circumstances which he has stated.” This is mere opinion,' founded upon data not disclosed and in part upon the opinion of another witness.'. Further remarks upón the subject are unnecessary. There are other defects in the evidence for the complainant, but it is unnecessary to advert to them. Altogether it fails wholly to sustain the case made by the bill. The decree of the court below is, in my opinion, prop-, erly reversed.

 9 Stab at Large, 446.

 7 Wallace, 700.

 10 Id. 68.

 16 Id. 402.

 Hickman v. Jones, 9 Wallace, 197.

 22 Alabama, 760.

 Burrough v. Moss, 10 Barnewall & Cresswell, 558; Whitehead v. Walker, 10 Meeson and Welsby, 696; Hughes v. Large, 2 Pennsylvania State, 108; Gullett v. Hoy, 15 Missouri, 400; Story on Bills, § 220.

 Judson v. Corcoran, 17 Howard, 614.

 1 Dow, 50.

 Murray v. Lilburn, 2 Johnson’s Chancery, 448.

 3 Kept’s Commentaries, 92; Chitty on Bills, 221; Smith v. Hiscock, 14 Maine, 449; Fairelough v. Pavia, 9 Exchequer, 690; Oulds v. Harrison, 10 Id. 579.

 Byles on Bills, 165.

 9 Opinions of the Attorneys-General, 413; 11 Id. 332.

 20 Howard, 343.

 2 Wallace, 110.

 Armstrong v. Boylan, 1 Southard, 76; Morehouse v. Mathews, 2 Comstock, 514.